COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Lemons and Senior Judge Cole
Argued at Richmond, Virginia


RODNEY T. CLARK

                                    MEMORANDUM OPINION* BY
v.    Record No. 2427-97-2          BY JUDGE MARVIN F. COLE
                                         AUGUST 3, 1999
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    James B. Wilkinson, Judge

          Patricia P. Nagel, Assistant Public Defender
          (David Johnson, Public Defender; Office of
          the Public Defender, on brief), for
          appellant.

          Richard B. Smith, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellee.


     Rodney T. Clark (appellant) was convicted in a jury trial

of possessing cocaine, robbery, use of a firearm in the

commission of robbery, murder, use of a firearm in the

commission of murder, malicious wounding, and use of a firearm

in the commission of malicious wounding.  On appeal, he contends

the trial court erred in:  (1) refusing to reverse his

convictions because the Commonwealth failed to timely disclose a

material, exculpatory witness, and to grant a continuance to

locate the exculpatory witness; (2) failing to appoint an expert

─────────────────

     * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

and in failing to grant a continuance to secure an expert witness; (3) preventing him from presenting a proffer to the court regarding the expert witness and the exculpatory witness; and (4) failing to strike all charges as a matter of law, other than the possession of cocaine charge, due to insufficient evidence.  Finding no reversible error, we affirm the convictions.

FACTS

"On appeal, we view the evidence in the light most favorable to the Commonwealth and grant to it all reasonable inferences therefrom."  Barlow v. Commonwealth, 26 Va. App. 421, 428-29, 494 S.E.2d 901, 904 (1998).  So viewed, the evidence proved that Jacquell Robertson and Frank Franisco, Jr. were shot in the early morning hours of January 14, 1997.  The police received a 911 call about a shooting, and Officer Mark Lewis proceeded to 1423 Minifee Street.  The house was owned by Franisco, and appellant resided there.  Lewis "went up to the front door, knocked on it, identified [himself] as a police officer," and demanded that the door be opened.  Looking through a glass pane in the door, Lewis saw a man in the house staring at him.  Lewis identified himself again and demanded that the man open the door.  The man "did not do that and continued to stare at [Lewis] for what seemed like 15 or 20 seconds."  Lewis "backed away from the door to inform the other officers around [him] what was going on."  A few minutes later, Officer Croce

-

accompanied Lewis to the front door and knocked with his flashlight. After about one minute, appellant opened the door. Croce found Robertson and Franisco in a bedroom, after which appellant was handcuffed by Lewis who maintained custody of him.

The police found two women in the house; they were unharmed. Other than Robertson and Franisco, appellant was the only male found inside the house. The evidence established that the windows and other doorways of the house were blocked, barred, or sealed closed.

Robertson testified that he was awakened late at night by several gunshots. At that time, he discovered that he had been shot in both arms and in his face. Before going to sleep, Robertson placed his handgun on a nearby television stand. When he awoke, Robertson saw appellant pointing Robertson's 9mm handgun at him. Appellant "demanded money and the keys to [Robertson's] car." Someone knocked on the front door, and appellant "went around to answer the door." Robertson tried "to barricade the door" of the room in which he was located, but before he could do so, appellant returned and shot him again in his hand. Appellant again "demanded the money and the keys." Robertson testified that he took about $300 out of his pocket and threw it onto the floor toward appellant. As the money hit the floor, Robertson heard the policemen arrive at the door. Robertson stated that appellant wore boots that night, and when the police asked if he knew who shot him, Robertson told them it

-

was "the guy with the boots on" and pointed to appellant. Robertson identified appellant in court as the man who shot and robbed him.

During a search of appellant, police officers recovered $449 in cash and an eyeglass case containing cocaine belonging to Franisco, the other shooting victim. Detective Paul Tuttle recovered two handguns from a trash can by the front door: Robertson's 9mm semi-automatic and a .32 caliber revolver. Appellant stipulated that his palm print was on the magazine or clip of the 9mm handgun.

Forensic scientist Douglas DeGaetano testified that appellant had gun primer residue on both of his hands. DeGaetano stated that primer residue will remain on a person's hands for a period of four to six hours. The bullet recovered from Franisco's body had been fired from Robertson's gun. Three empty cartridge casings recovered from the front bedroom also had been fired from Robertson's gun.

Franisco was in the same room as Robertson. He was supine on a couch after having received a gunshot wound to his mouth and neck region. The medical examiner, Dr. Leah Bush, testified that the bullet wound to Franisco injured his spinal column and spinal cord and rendered him a quadriplegic. On May 1, 1997, Franisco was released in stable condition from the Medical College of Virginia (MCV) Hospital and transferred to Manning Convalescent Center in Portsmouth. On May 11, 1997, Franisco

-

died of "[a]cute pneumonia with mucous obstruction of the right main stem bronchus . . . due to complications of quadriplegia." At trial, Bush opined that the cause of death was acute pneumonia due to complications of quadriplegia due to a gunshot wound.

### I.  FAILURE TO DISCLOSE EXCULPATORY WITNESSES AND TO GRANT CONTINUANCE TO LOCATE EXCULPATORY WITNESS

The questions whether the Commonwealth failed to disclose an exculpatory witness and whether the trial court should have granted a continuance to permit appellant to locate the exculpatory witness are inextricably bound together and will be discussed together.

On June 26, 1997, appellant filed in the trial court a motion for discovery, inspection and exculpatory evidence. At the trial, appellant did not complain that the Commonwealth failed to timely disclose the name of an exculpatory witness. Instead, he made a motion for a continuance as follows:

> Judge, . . . there was a witness named Al Pearce.  We have never spoken to Al Pearce. The Commonwealth provided us with the name of Al Pearce as an exculpatory witness.  He indicated that he saw two people running from the scene at the time this incident occurred.  We have never been able to get up with him.  We got posted service at the address provided to us by the Commonwealth. And, based on the Commonwealth saying that he would be an exculpatory witness, it certainly would appear to me that they would be in the best position, having talked to them, obviously that is important to our case.  That would be the . . . grounds for the continuance.

-

Appellant's counsel represented that, on numerous occasions, his investigator went to the address furnished by the Commonwealth but he did not find Pearce. He informed the court that he did not know what Pearce looked like and did not know if he had moved from the address. All he knew was that the Commonwealth had provided his name and address on a piece of paper.

The prosecutor advised the court as follows:

> As to the witness, Judge, I have provided Mr. LaRuffa and Mr. Amirshahi with the address and name of Mr. Pearce as soon as I got it from Detective Klein. I am trying to locate a specific date, I do know I gave it to them well before August 19th because there was a request about him, and I gave them the address that we had. We had no phone number for Mr. Pearce. Detective Klein got no returns on that. Once Mr. LaRuffa asked me about that I did provide it to him. In fact, it was on a small sheet of paper.

The Commonwealth's attorney had no further information and no one knew whether or not Pearce had any information about the crimes. Appellant wanted more time to try and locate Pearce; however, the trial court noted that appellant had over a month to find him. Concluding that there was no assurance that Pearce would be present at another trial if he continued the case, the trial judge denied the motion for a continuance.

"'"[A] motion for a continuance in order to obtain the presence of a missing witness is addressed to the sound discretion of the trial court whose decision will not be

-

reversed unless the record affirmatively shows an abuse of discretion."'" Gray v. Commonwealth, 16 Va. App. 513, 517, 431 S.E.2d 86, 89 (1993) (quoting Cherricks v. Commonwealth, 11 Va. App. 96, 99, 396 S.E.2d 397, 399 (1990)). The party moving for a continuance has the burden to show: (1) that the missing witness is "material," see Gray, 16 Va. App. at 518, 431 S.E.2d at 89; (2) that the party exercised diligence to procure the witness' presence, see Bryant v. Commonwealth, 248 Va. 179, 181, 445 S.E.2d 667, 669 (1994); Smith v. Commonwealth, 16 Va. App. 630, 636, 432 S.E.2d 2, 6 (1993); and (3) "that it is likely that the witness would be present at a later date," Chichester v. Commonwealth, 248 Va. 311, 322, 448 S.E.2d 638, 646 (1994).

The Commonwealth revealed Pearce's name to appellant as a source of potentially exculpatory evidence a month and a half before trial. Therefore, appellant had a considerable amount of time to find additional information to help locate Pearce and discover what information, if any, Pearce possessed. Appellant has not proved that appellant exercised diligence to procure the witness' presence at trial; and that the witness would be found and would be present at a later date. Under these circumstances, the trial judge did not abuse his discretion in denying the motion for a continuance.

In addition to the motion for a continuance, appellant argues that the Commonwealth failed to timely disclose a material, exculpatory witness, requiring reversal of his

-

convictions.  "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).  See Rule 5A:18.  Rule 5A:18 places the parties on notice that they must give the trial court the first opportunity to rule on disputed evidentiary and procedural questions.  The purpose of this rule is to allow correction of an error if possible during the trial, thereby avoiding the necessity of mistrials and reversals.  See Gardner v. Commonwealth, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986); see also Buck v. Commonwealth, 247 Va. 449, 452-53, 443 S.E.2d 414, 416 (1994).

Upon our review of the record, we find appellant did not specifically argue this issue to the trial court.  A trial court must be alerted to the precise "issue" to which a party objects. See Neal v. Commonwealth, 15 Va. App. 416, 422-23, 425 S.E.2d 521, 525 (1992).  Because appellant failed to argue this issue with any specificity, we are precluded from addressing it for the first time on appeal.  See Rule 5A:18.  Moreover, the record does not reflect any reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

II.  FAILURE TO APPOINT EXPERT MEDICAL WITNESS; FAILURE TO GRANT
CONTINUANCE TO SECURE EXPERT MEDICAL WITNESS

Appellant contends that the trial court erred in failing to appoint an expert witness to aid in his defense and in failing to grant a continuance for him to secure an expert witness.

The record discloses that Franisco was shot on January 14, 1997, and was rendered a quadriplegic as a result of the gunshot wound.  Approximately four months later, he was released from MCV Hospital in stable condition and placed in a nursing home in Portsmouth.  Ten days after being released from MCV Hospital, Franisco died of pneumonia with mucous obstruction of the right main stem bronchus due to complications of quadriplegia due to a gunshot wound to the mouth and neck.  In an August 7, 1997 motion to compel discovery, and at the August 12, 1997 hearing, appellant advised the trial court that Franisco's death was a trial issue; however, appellant did not request appointment of an expert.

For the first time, on September 24, 1997, appellant filed with the court a request for the appointment of an expert witness to assist defense counsel in preparing for cross-examination, to assist in reviewing hospital and nursing home medical records, and to provide expert medical testimony regarding the cause of death.  However, the request did not identify the name of any specific witness to be appointed.  At a hearing upon the motion on September 30, 1997, defense counsel

-

moved the trial court to allow appellant to have a medical

expert "to look into what might have been."  As justification

for the appointment, defense counsel stated the following:

> [M]edically speaking the victim was
> shot.  He was taken to MCV.  He was there
> about five months.  He was released in what
> would appear to me, having looked at the
> medical records, to have been in stable
> condition.  They released him from MCV and
> took him to a nursing home.  And, a very
> short while later, about 11 days later he
> passed away.  And the M.E. is going to try
> to cause, to tie the cause of death up to
> the gunshot wound that happened five, over
> five months earlier.

Although the trial court denied the motion, it indicated

that it would allow appellant to have an expert if he could

obtain one by October 1, 1997, when the trial was scheduled to

commence.  Appellant made no objection to this ruling.

At the October 1, 1997 trial, appellant renewed his motion

for a continuance, advising the court that he had not been able

to obtain an expert witness.  Defense counsel argued to the

court that he did not receive the autopsy report until September

18, 1997.  He reviewed the report and "[w]ithin a short period

of time after that we identified the need for an expert

witness . . . [and] filed the motion . . . to allow us that."

The record discloses that by mid-August defense counsel

considered Franisco's cause of death to be an issue in his

defense.  By the end of August, all of the medical records from

MCV Hospital and from the Portsmouth nursing home were filed in

-

the clerk's office pursuant to subpoena.  Defense counsel received a preliminary autopsy report and a final report as soon as they were available.  In spite of the presence of all of this information, appointment of an expert was not requested until the day before trial.  In overruling the motion for a continuance, the trial judge advised appellant that he would "keep the case in the breast of this court for 21 days" in case appellant could find an expert witness who could testify that the cause of death was unrelated to the gunshot wound.  Appellant did not return to court with such a witness during that twenty-one day period.  There is no representation, much less any evidence, that the autopsy report and cause of death are not accurate.

In Barnabei v. Commonwealth, 252 Va. 161, 477 S.E.2d 270 (1996), the Supreme Court stated:

> The Due Process and Equal Protection Clauses of the Constitution of the United States require the appointment of an expert, at the Commonwealth's expense, to assist an indigent defendant in his defense.  We make clear, however, that an indigent defendant's constitutional right to the appointment of an expert is not absolute.  We hold, instead, that an indigent defendant . . . must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," and that he will be prejudiced by the lack of expert assistance.  An indigent defendant may satisfy this burden by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the

-

denial of such services would result in a fundamentally unfair trial.

 *       *       *       *       *       *       *

Thus, an indigent defendant seeking the appointment of an expert has the burden of showing a particularized need therefor.  The required showing must be determined on a case-by-case basis, and a determination whether an adequate showing has been made is a matter that rests within a trial court's discretion.

252 Va. at 170-71, 477 S.E.2d at 276 (citations omitted).  <u>See also</u> <u>Husske v. Commonwealth</u>, 252 Va. 203, 211-12, 476 S.E.2d 920, 925-26 (1996).

Here, the trial court did not abuse its discretion in refusing the motion for a continuance to secure an expert when appellant failed to establish beyond speculation, suspicion, and hope that the expert would assist the defense.  Appellant did not demonstrate that the assistance of an expert was likely to be a significant factor in his defense.

### III.  PROFFER OF AL PEARCE'S TESTIMONY AND TESTIMONY OF EXPERT WITNESS

Appellant contends that the trial court erred in preventing him from presenting a proffer to the court regarding the statement of Al Pearce and the anticipated testimony of an expert medical witness regarding Franisco's cause of death.

-

## A. Proffer of Pearce's Statement

In argument upon appellant's motion for a continuance immediately before the trial on October 1, 1997, appellant's counsel represented to the court:

> The Commonwealth provided us with the name of Al Pearce as an exculpatory witness. He indicated that he saw two people running from the scene at the time this incident occurred. We have never been able to get up with him. We got posted service at the address provided to us by the Commonwealth. And, based on the Commonwealth saying that he would be an exculpatory witness, it certainly would appear to me that they would be in the best position, having talked to them, obviously that is important to our case.

The trial court inquired of appellant what due diligence had been used to find Pearce. Defense counsel responded that "our investigator went to that address on numerous occasions. We don't even know what he looks like, let alone whether he had moved from that address."

Based upon this representation of counsel, the trial court overruled the motion for a continuance, finding that there was no assurance that the witness would be present should the trial court continue the case.

After all the evidence was completed and the instructions agreed upon, appellant advised the court that he would proffer for the record

> what I believe the testimony of number one, Al Pearce, who was the witness that the Commonwealth provided us a name for. My

-

understanding was . . . that this individual would have said, had he been in court, that two people were running from the house at the time that this occurred.

Also, appellant said "my proffer is that they [sic] would have said two people ran from the house at the time that this occurred."

Thereafter, the following conversation took place between the Court and counsel:

> THE COURT: I don't think [defense counsel] can say that the witness said anything. He didn't talk to the witness. He could have said that I have talked to the witness and the witness told me this. My understand[ing] is you never talked to the witness, you don't have any idea where they are.
>
> [DEFENSE COUNSEL]: That's correct. And, the Court ruled accordingly, but I am still proffering to the Court what I believe that witness would say.
>
> THE COURT: I am not accepting it as a proffer. You haven't talked to the witness.

Appellant argues before us that the proffer relating to the testimony of Al Pearce was for the purpose of establishing the need for a continuance, and not for the purpose of evidence at trial. He claims that Pearce was a material witness because the Commonwealth's attorney provided his name and address as an exculpatory witness during the discovery process; therefore, it was important to appellant that the trial be continued in order to locate Pearce.

-

The Commonwealth responded that the name "Al Pearce" and the slip of paper with his name on it had been given to defense counsel at least six weeks prior to trial. According to the Commonwealth, it had no further information about him, and appellant had ample time to locate him and have him present.

Appellant requests us to reverse his conviction and grant a new trial because the trial court refused to accept his proffer. This we refuse to do. Assuming for the sake of this decision that the trial judge erred in refusing to accept the proffer, our decision would still be the same because appellant has shown no prejudice.

The law is clear that the purpose of a proffer is to place rejected evidence on the record so an appellate court may evaluate it and determine whether the evidence was wrongly rejected. See Whittaker v. Commonwealth, 217 Va. 966, 968, 234 S.E.2d 79, 81 (1977). See also Spencer v. Commonwealth, 238 Va. 563, 570, 385 S.E.2d 850, 854 (1989); Speller v. Commonwealth, 2 Va. App. 437, 440, 345 S.E.2d 542, 545 (1986). Because appellant never attempted to introduce the Pearce slip of paper or the contents of the paper through testimony of any witness during trial, they were never rejected as evidence in the trial court.

In this case, the record reveals what the proffered evidence would have been if the court had accepted or admitted it. We have the same basis for adjudication that we would have

-

had if the proffer were accepted.  As we have previously stated, a party moving for a continuance has the burden to show:  (1) that the missing witness is material; (2) that the party exercised due diligence to procure the witness' presence; and (3) that it is likely that the witness would be present at a later date.

In order to prove "due diligence" in procuring the presence of Pearce at the trial, defense counsel did not call any witnesses, but represented, according to the record, that his investigator went to the address given him by the Commonwealth's attorney on numerous occasions; he did not know if Pearce had moved from that address.  This was the total extent of appellant's proof that he exercised due diligence to procure the witness' presence and that it was likely that the witness would be present at a later date.  The record contains no evidence showing that the investigator canvassed the neighborhood to locate Pearce or ascertain his whereabouts, no evidence showing any effort to locate his employment, no effort to locate him through the Division of Motor Vehicles, and no effort to locate him through numerous other avenues available for such a purpose.

The trial court did not abuse its discretion when it refused to grant a continuance to appellant in order for him to attempt to obtain the presence of Pearce.  When we consider the additional Pearce statement, we reach the same decision. Appellant did not prove that he used due diligence to procure

-

the witness' presence, and he did not prove that the witness would likely be present at a later date.  We find no reversible error in the decision of the trial court on this question.

### B.  Proffer of Medical Witness

In regard to the issue of the proffer of the anticipated expert medical witness, on September 30, 1997, the trial court heard appellant's motion for a continuance in order to secure the services of an expert witness.  Appellant moved the court for the appointment of a medical expert to look "into what might have been."  The court ruled that the motion was too late and caused too much delay, but stated it would appoint an expert witness if appellant could find one in time for the trial.  Implicit in the court's ruling is that the Commonwealth would bear this expense.

At trial on the following day, defense counsel reported that he was unable to secure an expert witness and again asked for a continuance.  The court denied the continuance, and the trial proceeded.  Appellant did not attempt to proffer any evidence from an expert medical witness.  However, after the instructions were presented and argued upon, counsel made a motion that he be permitted to proffer for the record "that he would have been able to develop the issue of cause of death."

The trial judge ruled that he was not going to permit the proffer because he did not think it was a fact.  However, he advised defense counsel that he "will keep the case in the

-

breast of the court for 21 days" if counsel could find an expert who would testify that the cause of death was not related to the injury inflicted by appellant.

Appellant's attempted proffer of expert medical testimony was not what an expert would testify to, but rather what counsel hoped an expert would testify. Appellant did not produce an expert who would testify consistent with his attempted proffer. Because defense counsel was unable to locate an expert who supported his theory of the case, there was no witness testimony taken outside of the jury's presence to make a part of the record. Moreover, appellant has not proved an <u>unchallenged</u> avowal of counsel or a mutual stipulation of counsel of the testimony of a witness; nor has a witness' testimony been taken in the absence of the jury and made a part of the record in the manner prescribed by the Rules of Court. Therefore, the trial court did not err in refusing that proffer.

## IV.  SUFFICIENCY OF THE EVIDENCE

Viewed in the light most favorable to the Commonwealth, <u>see</u> <u>Barlow</u>, 26 Va. App. at 428-29, 494 S.E.2d at 904, the evidence proved that appellant shot Robertson. Robertson unequivocally identified appellant at the crime scene and at trial as the person who shot and robbed him. After appellant shot Robertson and demanded his keys and money, the police arrived at the house. Officer Lewis identified appellant as the person resembling the male who looked at him through the windowpane in

-

the door and who refused to open it.  Other than the two male gunshot victims, appellant was the only other male in the house when the police entered.  Appellant had gunshot residue on his hands, indicating that he recently fired a gun; also, his palm print was on the magazine/clip of the weapon that was used to wound Robertson and Franisco.  A search of appellant revealed Franisco's eyeglass case and a large amount of cash.  Robertson testified that appellant was not employed, yet appellant told Officer Spain that he earned the money from a roofing job.  Moreover, appellant gave Officer Klein a conflicting account of how he got the money.

As a result of his gunshot wound, Franisco was paralyzed from the neck down.  Because the bullet had perforated his spinal cord, Franisco's diaphragm was not functioning properly, and he could only breathe with the assistance of a respirator.  Franisco was hospitalized at MCV Hospital for four months, after which he was transferred to a convalescent home.  Franisco was stable at the time of his release from the hospital, but he died ten days later.  Medical examiner Dr. Leah Bush testified that the cause of death was "[a]cute pneumonia with mucous obstruction of the right main stem bronchus . . . due to complications from quadriplegia due to a gunshot wound to the mouth and neck."  Franisco's cough reflex was compromised, affecting his ability to effectively clear his airway.  Dr. Bush explained that Franisco developed a mucous plug in his right

-

main stem bronchus, and this, combined with the presence of the ventilator tube, led to a bacterial infection, which led to pneumonia.  Summarizing, Dr. Bush opined that Franisco "died as a result of getting a pneumonia infection, infection of the lung from his being quadriplegic and ventilator dependent due to this gunshot wound."  (Emphasis added.)  Dr. Bush testified that Franisco did not die of a drug overdose or as a result of a reaction to any of his medications.  Dr. Bush stated that MCV Hospital medical records gave no indication that Franisco had pneumonia at the time he was released from the hospital, and the fact that he was stable indicated that he no longer needed twenty-four-hour-a-day care at the time of his release.

"When a conviction is based upon circumstantial evidence, such evidence 'is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" Hollins v. Commonwealth, 19 Va. App. 223, 229, 450 S.E.2d 397, 400 (1994) (citation omitted).  "The Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant."  Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993).  Efforts to avoid detection are circumstantial evidence of guilt.  See Black v. Commonwealth, 222 Va. 838, 842, 284 S.E.2d 608, 610 (1981).

When a defendant has inflicted wounds upon a victim that result in an affliction or a disease, the defendant is criminally responsible for the victim's death from that affliction or disease if the wounds caused the death indirectly through a chain of natural effects and causes. An intervening event, even if a cause of death, does not exempt the defendant from liability if that event was put into operation by the defendant's initial criminal acts.

Commonwealth v. Jenkins, 255 Va. 516, 521, 499 S.E.2d 263, 265-66 (1998) (citations omitted).

In Jenkins, the defendant shot the victim on May 21, 1995. The victim was taken to the hospital where he received medical treatment. Four days later, the victim died while still in the hospital. The medical examiner testified that the victim died as a result of aspirating his own vomit "'following the gunshot wound to the abdomen.'" Id. at 518, 499 S.E.2d at 264. The Supreme Court found that the Commonwealth's evidence was sufficient to prove that the defendant's actions were the proximate cause of the victim's death. See id. at 521, 499 S.E.2d at 266.

Robertson identified appellant as the man who shot and robbed him. He testified that the shooting was committed with his gun. Appellant's palm print was recovered from the clip of the weapon used to inflict injury on both victims. Appellant gave inconsistent accounts of how he acquired the money. Furthermore, when police knocked on the door and demanded entry, appellant delayed in responding. He also attempted to hide

-

evidence by placing the murder weapon in a trash can.  From this evidence, the jury could reasonably infer that, in addition to shooting Robertson, appellant robbed him and also shot Franisco.

The Commonwealth's evidence was also sufficient to prove that the gunshot wound was the proximate cause of Franisco's death.  Dr. Bush testified that Franisco died from pneumonia, which was caused by complications arising from the gunshot wound.  There was no evidence that Franisco had pneumonia prior to being shot, nor was there any evidence of any independent intervening cause of death.

The jury believed the Commonwealth's evidence and rejected appellant's evidence.  "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide."  Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of murder, robbery, malicious wounding, and using a firearm in the commission of these crimes.

Accordingly, appellant's convictions are affirmed.

Affirmed.

-